**In re Alex R. SMITH, Debtor.**

**No. 03–21502.**

United States Bankruptcy Court, D. Idaho.

Feb. 25, 2005.

Bruce A. Anderson, Louis Garbrecht, Savi Grewal, Coeur d'Alene, ID, Alex R. Smith, Wallace, ID, for Debtor.

Charles R. Dean, Jr., Dean & Kolts, William Appleton, Coeur d'Alene, ID, for Trustee.

## MEMORANDUM OF DECISION

TERRY L. MYERS, Chief Judge.

### INTRODUCTION AND PROCEDURAL BACKGROUND

On September 17, 2003, Alex Smith ("Debtor") filed a voluntary chapter 13 petition. Doc. No. 1. Prior to this filing, Debtor commenced litigation against family members, closely-held family corporations, and others in the Idaho state courts. *See, e.g.,* Doc. No. 5 (referencing *Eugene I. Annis, Guardian Ad Litem for Alex R. Smith v. Dave Smith Chevrolet Oldsmobile Pontiac Cadillac, Inc., et al,* Case No. CV 03–1818, First Judicial District, State of Idaho, in and for Kootenai County (the "State Court Action")).

The chapter 13 trustee, C. Barry Zimmerman ("Trustee"), in conjunction with Debtor and Debtor's first bankruptcy attorney, sought approval of the employment of special counsel, on a contingency fee

basis, to represent the interests of Debtor and the bankruptcy estate in the State Court Action. *See* Doc. Nos. 7, 8. By an order entered in October, 2003, the Court approved the employment of Charles R. Dean, Jr. ("Special Counsel") under § 327(e) to handle the State Court Action for the Debtor and estate. *See* Doc. No. 31. The State Court Action continued. *See* Doc. No. 33 (order terminating stay).

At a hearing on November 20, 2003, Debtor was found to be ineligible for chapter 13 relief, and the Court indicated that the case would be converted to a chapter 7 liquidation unless Debtor sought conversion to chapter 11 instead. *See* Doc. No. 40. Debtor requested such a conversion to chapter 11, *see* Doc. No. 42, and that matter was heard on December 22. By ruling entered the following day, the Court denied Debtor's request, and converted the case to chapter 7. *See* Doc. Nos. 60, 62. The chapter 13 trustee, Mr. Zimmerman, was appointed as the chapter 7 trustee.

Trustee requested that the employment of Special Counsel be continued. *See* Doc. No. 67. Over objection, that request was granted in March, 2004. *See* Doc. Nos. 81, 82.

The State Court Action progressed further. An attempted mediation was unsuccessful.

On December 3, 2004, Trustee filed a Notice of Sale and Compromise of Claim. *See* Doc. No. 88 (the "Notice").[1] The Notice indicates Trustee's intent and request that he be allowed to sell all the estate's interests in Dave Smith Chevrolet Oldsmo-

bile Pontiac Cadillac, Inc. ("Dave Smith Motors"), Frontier Leasing & Sales, Inc. ("Frontier"), River Management, LLC ("River"), and "any related or affiliated entities" *and* to compromise the estate's claims in the State Court Action for the sum of $2,000,000. *Id.* at 1–2.

The Notice further indicates that $1,000,000 would be paid immediately upon requisite Court approval, with a promissory note provided for the remaining $1,000,000. That note would be payable with interest at 4.73% per annum in monthly installments in the amount of $10,475.07. *Id.* at 2. The term of the note is not disclosed, though the information provided supports the conclusion that it would be a 10 year term (120 months).

The compromise of the litigation involves the defendants in the State Court Action, including Dave Smith Motors, Frontier, and River. The sale would be to Dave Smith Motors or its assigns. The note would be signed by Ken Smith as "accommodation maker." *Id.* at 2.

Debtor objects to the proposed sale and compromise. Doc. No. 93. An evidentiary hearing on the matter was held on February 1, 2005. Trustee's request was taken under advisement on February 11, upon submission of post-hearing briefing.

The Court concludes that, under applicable precedent, Trustee did not meet his burden of showing that the suggested compromise is fair and equitable and should be approved. His request for Court approval of that compromise, and the conjoined re-

---

1. Trustee's Notice views the relief requested as comprising both a sale of estate assets and a compromise of disputes. Ordinarily, sales under § 363 are advanced through notice, *see* Fed. R. Bankr.P. 6004 and LBR 2002.1, while proposed compromises and settlements are advanced by motion, *see* Fed. R. Bankr.P. 9019(a). Trustee, however, scheduled the Notice for hearing on February 1, 2005 and provided ample time and opportunity for parties to appear and be heard. *Accord* Fed. R. Bankr.P.2002(a)(2), (a)(3) (requiring 20 day notice of, respectively, proposed sales and hearing on approval of compromises). The fact that Doc. No. 88 was not identified or filed as a Rule 9019 "motion" is not deemed to be significant.

quest for approval of sale of property of the estate, will be denied.

## FACTS

The evidence presented at the hearing establishes the following.[2]

Dave Smith Motors is a closely-held family corporation that operates a new car dealership in Kellogg, Idaho, a small town in Idaho's panhandle. The now-deceased founder of the enterprise, Dave Smith, was Debtor's father. Debtor's brother, Kenneth Smith, is the current president of the corporation and chief operations manager of the business. He owns 55% of Dave Smith Motors. Debtor owns 30% of that corporation. Other family members own the remaining 15% of the company.

Though located in a remote and sparsely populated area, Dave Smith Motors has developed into one of the most successful car dealerships in the Pacific Northwest. Recent press reports, validated by Kenneth Smith's testimony, reflect gross sales of $350,000,000.00 last year, an increase of $50,000,000.00 over the prior year. Testimony indicated that the corporation's balance sheet in 2003 showed a net worth of $10,900,000.00.

Kenneth Smith, Debtor and other Smith family members who hold stock in Dave Smith Motors do not receive dividends or other similar distributions from this highly successful endeavor. Kenneth Smith testified that it was his father's intent and design that family members be paid "salaries" for services they rendered to the dealership, but that all profits are otherwise reinvested into the business. He indicates that this situation will continue until such time as the amount of cash flow equals the amount of the business' inventory, something he expects will not occur for a number of years.

The amount of these salaries, like other significant corporate decisions, are made by the shareholders. Kenneth Smith controls those decisions given his majority ownership and his role as managing officer. His salary in 2004 was approximately $1,700,000.[3] Kenneth Smith viewed this as commensurate with his services and efforts and his success in running the business. Kenneth Smith's wife received $150,000. Other family members, other than Debtor, apparently received some compensation. Debtor received none that year, though he had received compensation in prior years.[4]

Dave Smith Motors operates its dealership on real property in Kellogg, Idaho owned by River. The evidence regarding River's value indicated the land was worth in excess of $660,000[5] against which exist-

---

2. The Court's findings of fact and conclusions of law, required on the contested matter under Fed. R. Bank. P. 9014 and 7052, are set forth in this Decision. All factual findings based on testimony include the Court's evaluation of witnesses' credibility, and of the weight to be accorded their testimony. The Court emphasizes that these findings relate only to the submissions made in support of or in opposition to the suggested compromise. They are based on the limited evidence produced at the hearing on February 1. Ultimate fact finding is obviously the province of the state court, should the matter be tried.

3. Kenneth Smith testified that he receives no "bonus" in addition to his salary. However, the salary is variable and reflects the business' success. A business appraiser retained by Dave Smith Motors and related parties testified that her review of financial data for the years 1999 through 2003 reflected a range for Kenneth Smith's annual salary of $625,000 to $1,841,000 with an average during that period of $1,300,000.

4. That the amounts of these "salaries" were commensurate with market compensation for the amount and type of work performed was not addressed.

5. The basis for this value appeared to be an appraisal in 1998 at the time Dave Smith passed away.

ed a secured indebtedness of around $199,000. Dave Smith Motors pays rent to River in the amount of $9,000 per month.[6] However, River's required debt service is only $4,000 to $5,000 per month. Kenneth Smith testified that the excess cash flowing to River had been used by River to prepay principal on the mortgage debt. Kenneth was unclear as to whether this occurred only once a year from accumulated cash reserves or irregularly throughout the year.

Like Dave Smith Motors, River pays no dividends or other distributions of profit to its owners. Debtor owns 32.95% of River. Kenneth Smith owns the rest and controls its business and financial operations.

Frontier is a related operation, selling used cars and trucks on property in Coeur d'Alene, Idaho. It provides a means for Dave Smith Motors to liquidate used car inventory taken as trade-in vehicles upon its sale of new cars and trucks. Book value of Frontier was allegedly around $800,000.00. Debtor owns 25% of Frontier. Like Dave Smith Motors and River, no distributions of profits are made to shareholders through dividends.

As noted, the Notice contemplates Trustee's sale (to Dave Smith Motors or its assignee) of Debtor's interests (now the estate's interests) in Dave Smith Motors, Frontier and River. Trustee and the defendants in the State Court Action, who had negotiated this sale and the related settlement with Trustee, presented two expert witnesses at hearing to testify about the value of Debtor's minority interests in the three corporations.[7]

One of these witnesses, Ms. Anderson, opined that Debtor's 30% stock ownership in Dave Smith Motors, 25% stock ownership in Frontier and 32.95% membership interest in River were collectively worth between $1,780,000 and $2,280,000, with the bulk of the value attributed to the stock in Dave Smith Motors. The other witness, Mr. Boyd, pegged the aggregate value of Debtor's minority interests at $1,250,000.

Both witnesses emphasized the difficulties involved in attempting to value minority interests in closely-held corporations, and in marketing such interests. Various "lack of marketability discounts" or "minority share discounts" were thus applied to reach their respective conclusions.

These witnesses addressed only the calculation of a value or range of values for Debtor's ownership in the three businesses. They did not attempt to render opinions on the values of the three entities as a whole. Nor did they address any of the issues, other than the value of Debtor's minority interests, being litigated in the State Court Action.

In regard to the merits and value of Debtor's claims in the State Court Action, Trustee called one of the attorneys for the defendants in that litigation, Harvey Richman. Mr. Richman denigrated the strength of the complaint and Debtor's chances of success. He was obviously,

---

**6.** The evidence indicates, but did not establish, that this was a "triple net" lease. years 1999

**7.** Debtor and Special Counsel, who opposed the sale and settlement, called no witnesses at the February 1 hearing other than Kenneth Smith as an adverse witness. They attempt to rely on an affidavit of Darrel K. Chapman that was attached to Debtor's objection, Doc.

No. 93, as affirmative evidence regarding the businesses' valuation. *See, e.g.,* Doc. No. 101 (Closing Brief) at 5–6. The affidavit may not be considered. Fed. R. Bankr.P. 9014(d) establishes that "[t]estimony of witnesses with respect to disputed material factual issues [in contested matters] shall be taken in the same manner as testimony in an adversary proceeding."

however, not impartial. Mr. Richman is defending the State Court Action, and his clients are the ones attempting to settle with Trustee under the Notice.

As noted earlier, Trustee retained Special Counsel to represent the interests of the estate in the State Court Action. After the failure of mediation, the State Court Action was scheduled for trial in May, 2005.[8] Special Counsel is handling the matter on a contingency fee basis.

Trustee conceded that he did not consult with Special Counsel on the merits of the proposed compromise of the litigation.[9] In point of fact, Special Counsel appeared at hearing and vigorously opposed the suggested settlement, contending that it did not appropriately account for either the value of Debtor's stake in the three corporations or the potential recoveries in the litigation.[10]

In addition to Special Counsel, Debtor appeared through his current bankruptcy counsel[11] and objected to the sale of assets and compromise of litigation. Debtor's standing to do so is inescapable. The total claims asserted in this chapter 7 case are far less than the suggested amount of the settlement, and it appears that Trustee would be able to fully pay all administrative expenses and creditor claims from the $1,000,000 cash component of the settlement.[12] Thus, under § 726(a)(6), the balance of the property of the estate remaining will be distributed to Debtor.[13]

---

8. Both Mr. Richman and Special Counsel indicated the cause was "first set" and they expected it to be tried as scheduled.

9. Trustee, when questioned why he would not solicit and consider the opinions of his own retained advocate, indicated that he talked instead with his general bankruptcy counsel, Mr. Appleton, and relied on that attorney to communicate with Special Counsel and gain Special Counsel's input. The nature and magnitude of consultation between lead counsel and Special Counsel was not addressed in the evidence.

10. The Court is aware that, like Mr. Richman, Special Counsel is not impartial. The Court has attempted to cull from the testimony of Mr. Richman, and the questioning by and arguments of Special Counsel, those matters regarding the suit that can properly be considered and are probative of the issues this Court must presently decide. The subjective opinions of such attorneys, regardless how sincerely held, that the State Court Action either wholly lacks merit or has substantial merit are not such matters.

11. Ms. Grewal replaced Debtor's initial attorney, Mr. Garbrecht.

12. As of the date of this Decision, the "claims register" maintained by the Clerk indicates that 18 claims have been filed, totaling $568,565.92. Of this amount, $9,000.00 is asserted as a priority unsecured claim; the balance are nonpriority unsecured claims. Two of the nonpriority unsecured claims, totaling $62,428.68, appear to be duplicates, leaving $497,137.24. Two claims were filed by Dave Smith Motors, totaling $278,802.22 (about 56% of the total nonpriority claims). Neither claim contains sufficient information or documentation to establish a basis for giving it prima facie evidentiary effect. *See Hilton v. Hongisto (In re Hongisto)*, 293 B.R. 45, 50 (N.D.Cal.2003) (discussing sufficiency of averments in proof of claim necessary to obtain such status under Fed. R. Bankr.P. 3001(f), citing *In re Consolidated Pioneer Mortgage*, 178 B.R. 222 (9th Cir. BAP 1995)). Importantly, the Notice is silent as to whether this *settling* defendant will waive these alleged claims (or that they are within the "counterclaims" being resolved by the settlement of the State Court Action) or whether it will, in effect, expect to receive payment from the estate on these proofs of claim. If the latter, fully one-fourth of the $1,000,000 cash component of the *settlement will go back to* Dave Smith Motors, and the amount of the cash component of the settlement that Debtor might expect to receive will likewise be reduced.

13. How the 10–year note would be treated in estate administration or closing is a somewhat open question; it was not addressed in the Notice and not specifically discussed at the hearing. To the extent it is contemplated

Finally, it can be noted that Debtor previously signed a "consent" to the sale and compromise. *See* Doc. No. 90. But it must also be noted that he mailed that consent to the Court along with a handwritten letter expressing a belief that the interests in the businesses were worth considerably more than what was being offered, and that his consent was in part based on his brother's promise that Debtor would be given a job. *See* Doc. No. 89. Debtor indicated that he was "scared to death that [he] might make a[w]rong decision" and that the Court might approve the $2,000,000 settlement and Debtor would have neither a job nor a relationship with his family. *Id.* In addition, there was testimony that the consent was obtained simultaneously with or in close proximity to a payment of $2,000 in cash to Debtor by or on behalf of Kenneth Smith, though Kenneth Smith characterized this payment as merely a "Christmas present" to Debtor.

## DISCUSSION AND DISPOSITION

### A. Standards

This Court stated in *In re Marples,* 266 B.R. 202, 01.3 I.B.C.R. 116 (Bankr.D.Idaho 2001):

Trustees are generally and properly given broad discretion to decide how to perform the myriad duties imposed on them by the Bankruptcy Code. Among these discretionary powers is the ability to negotiate settlements and compromises of disputes.

However, the Trustee is a representative of all the creditors of the estate. For that reason, his ability to settle and the bounds of his discretion are not limitless. Rule 9019(a) recognizes that the Court's approval of the proposed compromise or settlement is necessary and

that such approval can occur only after notice has been provided to creditors and other parties in interest.

The standards which guide the Court in fulfilling its role in reviewing compromise proposals are well settled. *In re Lake City R. V., Inc.* 226 B.R. 241, 98.4 I.B.C.R. 104 (Bankr.D.Idaho 1998) held:

The Court may approve a compromise only if it is "fair and equitable" and that determination must be supported by a sufficient factual foundation. *[Martin v. Kane (In re A & C Properties),* 784 F.2d 1377 (9th Cir. 1986)]* at 1383.

In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider:

(a) The probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *In re Flight Transp. Corp. Secs. Litig.,* 730 F.2d 1128, 1135 (8th Cir. 1984) (citations omitted), cert. denied, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985).

*A & C,* 784 F.2d at 1381. This standard has been expressly recognized in this District. *In re Pintlar/In re Gulf USA Corp.,* 94 I.B.C.R. 76, 77 (Bankr.D.Idaho 1994). "The trustee, as the party proposing the compromise, has the burden

---

that Debtor will receive this note as a portion of his § 726(a)(6) distribution, he clearly has

standing.

of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *A & C*, 784 F.2d at 1381.

226 B.R. at 243–44; 98.4 I.B.C.R. at 105. *See also, In re Western Appliance, Inc.*, 96.1 I.B.C.R. 32, 33–34 (Bankr.D.Idaho 1996). *Accord, Martinson v. Michael (In re Michael)*, 183 B.R. 230, 233, 238–39 (Bankr.D.Mont.1995).

266 B.R. at 206. Both proponents and opponents of the compromise have identified this controlling authority. They differ markedly on its application to the Notice.

## B. Issues and factors related to the compromise

### 1. Probability of success in the litigation

■ This element is inevitably a matter of some conjecture. Litigation is by its nature unpredictable. The Court is required to evaluate any objective factors shown by the evidence that might arguably relate to the possibilities of success or failure should the suit be tried rather than settled.

Trustee's reliance on the testimony of Mr. Richman in support of this element left something to be desired. Mr. Richman is, no doubt, an effective and zealous advocate. However, most of what he provided in the context of the instant matter was subjective opinion if not hyperbole.[14]

Serious issues are raised in the State Court Action regarding Debtor's interests in the three closely-held entities and the conduct of Kenneth Smith and others toward Debtor. The State Court has granted summary judgment to the defendants on certain causes of action. But it has denied summary judgment on several others.[15]

The Court was provided only limited evidence at the February 1 hearing upon which to evaluate the dynamics and likely outcome of the remaining portions of the litigation.[16]

As noted, the trial is scheduled for May 23 of this year. Both parties have indicated that they are prepared to proceed, and indicate that the State Court has the matter scheduled in such a way that it is unlikely to be vacated in favor of other

14. The brief of the settling defendants chastises the affidavit of Special Counsel for essentially the same lack of objectivity, calling his subjective opinions "meritless". Doc. No. 97 at 2, 6.

15. The Court has considered the written decisions entered by Judge Luster in the State Court Action, though it has done so based on what Judge Luster actually said and held, and not based on how the litigants have attempted to construe or characterize his rulings. For example, Judge Luster noted that in the State Court Action:

there were twenty-eight (28) causes of action. Defendants' Motion for Summary Judgement has been granted to Defendants on twelve (12) of the causes of action, but it was denied on sixteen (16) of the causes of action.... Plaintiff's and Defendants' Motions for Partial Summary Judgment and Summary

Judgment narrowed the focus, but did not eliminate all of the issues. This case involves complicated facts and an intertwined and complex set of business enterprises. At the heart of the matter are allegations regarding the duties owed by Kenneth Smith and others to Plaintiff and the decisions made by Kenneth Smith and others.
Doc. No. 91, Attach. 7 at 6 (Mem. Op. & Order: Recons. (Second)).

16. Trustee's proof consisted of Mr. Richman's testimony and Trustee's testimony that he had evaluated the matter with his counsel, Mr. Appleton who had in turn, Trustee said, talked to Special Counsel. As noted, Debtor provided no affirmative evidence at hearing. Instead, Debtor relied upon cross-examination of Trustee's witnesses and, ultimately, on the fact that Trustee bears the burden of proof and persuasion that the compromise is fair and equitable and should be approved.

matters. One readily concludes that both sides are confident, and believe their positions will be effectively, indeed successfully, presented at trial.

Defendants may hold the upper hand insofar as expert witnesses are concerned, something not all that surprising given the tremendously disparate financial resources of the litigants. However, how that testimony plays out and is evaluated by the trier of fact obviously remains to be seen.

Ultimately, the probability of "success" in the suit, and the economic magnitude of such success, was not shown. But neither was it shown that the litigation was valueless.

## 2. Difficulties to be encountered in collection

All the parties are in essential agreement that, were Debtor to prevail in the State Court Action, there would be little difficulty in collecting a judgment. The defendants in the State Court Action have significant resources, as the evidence at hearing amply established.

## 3. Complexity of litigation, and expense and delay attending it

The State Court Action is complex and presents numerous issues of fact and law. Still, it is slated to be tried within just a few months, and there is not much delay before the matter is presented for decision. Naturally, there may be some delay from the submission of evidence to a final trial court decision, and there is always the possibility of appeal.

Expense of the litigation to the estate is limited by the contingency fee agreement under which Special Counsel represents the estate. Proponents of the settlement argued that the estate could be exposed to an award of costs and fees against it, and perhaps affirmative relief on counter-claims. Neither the likelihood of such recovery nor its magnitude was established.

## 4. The interests of creditors (and others)

*Marples* noted that the interests of creditors can at times be hard to ascertain, especially when creditors decline to express their views. 266 B.R. at 207. Here, all creditors—save the defendants in the State Court Action—have remained silent.

Trustee suggests, however, that because the settlement's cash component is sufficient to fully pay all creditors, it is thus safe to surmise their support of the agreement from the lack of objection. That appears sensible under the circumstances. The settlement would provide for sufficient cash to pay all creditors in full with interest within a relatively short period of time. The interests of creditors generally would support settlement.

But the case is unique. Even if the Court limited its focus to just the $1,000,000 cash component of the settlement, Debtor also has an unarguable stake. Under § 726(a)(6), Debtor will receive whatever surplus exists after administrative expenses, creditor claims (timely or untimely filed), and interest on claims are paid. The Court does not read the case law, in speaking of the interest of *creditors* and a deference to their views, as unequivocally excluding the interests of the *debtor* where the estate is solvent or the proposed settlement would make the estate solvent.

The views of those who are to receive the benefit of a settlement, or who would bear the exposure of potential loss if the cause is unsuccessfully tried, should be considered with appropriate deference. Creditors' interest in the prompt and full cash payment of their claims is self-evident. However, Debtor feels the settlement does not adequately compensate *him*

for his interest in the three businesses or for the claims to damages and other relief asserted in the litigation. Though he stands last in the § 726(a) line, perhaps half or more of the $1,000,000 cash component of the settlement and all the deferred settlement distributed under the note will go to him.

### 5. Other considerations

There is a tendency when considering "factors" to approach the analytical exercise mathematically, toting on a scorecard the factors that either support approval on the one hand or caution against it on the other. The tendency should be avoided. Little in life, much less litigation, is susceptible to such simple arithmetic.

Proof of this can be seen in the foregoing discussion. Certain factors tilt decidedly in favor of the proposal, and others in the opposite direction. Still others add little to the balance, as they are inherently equivocal in nature or inadequately proven. At best, such factors provide analytic tools by which proof can be sifted and weighed, assisting the Court in appropriately exercising its discretion.

While the Court "must consider" the four factors, see A & C, 784 F.2d at 1381, it concludes that it should not reflexively reject any other fact or factor that relates to whether the compromise is "fair and equitable." There are such factors here.

The Notice reflects that of the $2,000,000 the parties deem sufficient to (a) buy Debtor's interests in the businesses and (b) settle his litigation claims, $1,000,000 will be paid in cash. Trustee's submissions and arguments reflect his intention to use these funds to satisfy his administrative obligations and all creditor claims. His Notice does not specifically address who receives the 10 year note,

though one must assume it to be Debtor. That Trustee would keep the estate open and administer the payments on the note is highly unlikely.

Given the nature of the underlying litigation, the history of family discord, and Debtor's opposition to the settlement, approving a settlement that requires Debtor to accept a note payable over ten years by his brother has not been shown to be reasonable.

Nor has Trustee justified the use of a note at all. The inability of the settling parties to fund the entire settlement in cash was not established. The evidence (including gross annual sales figures for Dave Smith Motors, income figures for Kenneth Smith, and some discussion of the assets, balance sheets, and net values of all three businesses) would indicate that the defendants either have the necessary resources to support a cash settlement or could readily obtain additional required amounts.

Finally, Trustee has failed to justify that the terms of the note are fair and equitable. First, the ten year term appears unduly long and is unexplained. Second, the note appears to be unsecured, and the reasons why are not explained. Third, the note bears interest at a rate of 4.73% per annum on the unpaid obligation. With the reported prime rate [17] at 5.50%, the reasonableness of requiring Debtor to accept a stream of payments at this rate, not to mention a fixed rate over ten years, is unexplained.

The Court concludes from the entirety of the evidence that credible and legitimate concerns are presented regarding the fairness and adequacy of the settlement, and that Trustee did not sustain his burden.

---

**17.** *See www.Bankrate.com* (last visited February 25, 2005).

## C. Issues related to sale

Trustee is not just settling litigation. He is also proposing to sell Debtor's interests in Dave Smith Motors, Frontier and River. Some of the issues related to sale are interwoven with those of settlement discussed above. But the presence of the proposed sale implicates additional authorities and considerations.

The first are procedural. Sales by a trustee of property of the bankruptcy estate are authorized by § 363, and implemented through Fed. R. Bankr.P. 6004. As previously noted, Fed. R. Bankr.P. 2002(a)(2) requires notice to be provided to creditors.

In this District, sales are also subject to the provisions of Local Bankruptcy Rule 2002.1. In order to comply with this Rule, the notice of sale must include, *inter alia*, a description of the property to be sold; the time and place of sale; the terms of sale; whether the property is to be sold free and clear of liens; the estimated fair market value of the property and a brief statement of the basis for the estimate. *See* LBR 2002. 1(b)(1)(A)-(E). The Notice did not comply with LBR 2002.1 in several important regards.

First, in describing the property to be sold, Trustee did not specify the nature of the interests Debtor held in the three business entities. Moreover, he indicated that the sale would include Debtor's interests in "any and all related or affiliated entities" but he provided no explanation of what this referenced. Further, even if limited to just the three businesses, Trustee did not indicate in his Notice the estimated fair market value of the property to be sold, nor did he identify the basis for his estimate. LBR 2002. 1(b)(E).

The evidence on the value of Debtor's minority holdings in Dave Smith Motors, Frontier and River came primarily from the experts retained by the settling defendants/proposed purchasers. Trustee, during his testimony, did not present any other or different basis for advancing the idea that the estate's significant minority stake in these successful businesses should be something less than $2,000,000.

The more persuasive of the two defendant-retained experts, Ms. Anderson, opined that after "lack of marketability discounts" and "minority shareholder discounts," the value of Debtor's interests in the three business was in the range of $1,780,000 to $2,280,000, and that the acquisition of the interests for $2,000,000 would be within her analysis.[18]

That the purchasing parties' retained expert would validate the proposed purchase amount is not surprising. And that a trustee might wish to give some weight to the opinion of the purchaser is not improper or objectionable. However, a trustee's duty to the creditors and estate requires more than mere adoption of the position advanced by the party on the other side of the negotiating table.

It is true that Trustee here testified that, in his years of experience, minority positions in closely-held corporations are difficult to sell. He also indicated that, if sold, they often bring less than the amount mathematically derived from multiplying the holder's percentage interest by the book or other value of the corporation. He further testified that, when dealing with car dealerships, the nature of franchise and similar agreements with automobile companies complicate matters further

---

18. Ms. Anderson's expertise is in the area of valuation of auto dealerships and interests therein. River is not such an entity. Her opinions as to the value of River were outside her specialty. The foundation and methodology for her conclusions regarding River were not particularly clear.

and reduce the value of the minority interests. These observations are certainly entitled to some deference.

At the same time, Trustee indicated that he had not reviewed the franchise, dealer or other agreements applicable here. Nor had he reviewed current financial statements, documents and information for the entities. Kenneth Smith's testimony validated Debtor's assertion that Dave Smith Motors had significant gains in gross sales in 2003 and 2004. But, the most recent balance sheet Trustee reviewed was for 2002, and he had not asked for or reviewed tax returns.

Trustee did not evaluate River's real estate documents. Debtor's interest in that limited liability company is 32.95% which is a larger (though still minority) share than he holds in Frontier or Dave Smith Motors. River does not appear to present the franchise or dealer agreement issues that concern Trustee. River holds property, with a value substantially in excess of debt, and has a triple net lease more than sufficient to cover debt service. Whatever impediments might exist to the attempted sale of a minority interest in Dave Smith Motors or Frontier, Trustee did not show similar sorts of issues were present in regard to a sale of Debtor's interest in River.

Trustee also indicated that he had not communicated with his Special Counsel, relying instead on his primary bankruptcy counsel to do so. Special Counsel is certainly in a position to provide access to information related to the valuation of the estate's interests in the businesses, even if Trustee were to believe that Special Counsel (like Richman) would mostly advance an advocate's view. Under the circumstances, Trustee should consult with the estate's Special Counsel and address candidly the specific facts and issues related to Debtor's minority interests in the businesses as well as those related to other aspects of the litigation.

These several factors go to the Trustee's estimate of the value of the estate's interests in the entities and his informed basis for that valuation. They lead the Court to the conclusion that Trustee's sale request and the portion of the Notice addressing sale of property of the estate are, at present, procedurally and substantively inadequate. This is an additional reason to withhold approval of the compromise.

## CONCLUSION

A trustee is given broad discretion to negotiate compromises and to propose sales of estate assets. The Court harbors no doubt that Trustee here has the interests of the estate and its creditors firmly in mind, and believes the suggested sale and settlement appropriate. Certain of the factors identified by Trustee are credible and support a settlement, particularly one that in a "universal" sense resolves both the litigation and the treatment and bankruptcy administration of Debtor's minority interests in the family businesses.

However, several key factors do not support the arrangement set forth in the Notice. Insufficient evidence was presented to support a judicial validation of Trustee's judgment that this particular sale of estate assets and compromise of estate claims is fair and equitable and should be approved. An appropriate order will be entered.